UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VELLAR OPPORTUNITY FUND SPV LLC - SERIES 10<br><br>*Plaintiff*,<br><br>-against -<br><br>LANZATECH GLOBAL, INC.,<br><br>*Defendant*. | No. _____<br><br>**COMPLAINT** |

Plaintiff Vellar Opportunity Fund SPV LLC - Series 10 ("Vellar") brings this action for breach of contract against Defendant LanzaTech Global, Inc. ("LNZA"), and alleges as follows:

## INTRODUCTION

1. This is an action for breach of contract resulting from LNZA's failure to pay amounts owed under a structured financing arrangement. Plaintiff Vellar provided Defendant LNZA with financing in the form of a prepaid forward purchase of LNZA shares. The parties entered into this transaction in anticipation of a merger between AMCI, a blank check company (commonly called a SPAC), and LNZA, its operating company target.

2. AMCI launched in 2021 with a stated purpose of finding a private company in the "clean energy" sector to take public via a reverse merger. A few months later, in March 2022, AMCI entered into a merger agreement with LNZA.

3. But the merger encountered headwinds and languished for nearly a year. Struggling to make the merger economically feasible, AMCI and LNZA sought additional capital from third parties through various financing transactions. The forward purchase transaction between AMCI, LNZA, and Vellar was one such deal, negotiated 10 months after the AMCI/LNZA merger was agreed upon. Under the forward purchase transaction, Vellar would acquire a minimum amount

1

of AMCI shares on the open market, and then waive the right to redeem those shares—waiver being a standard option for SPAC investors who desire a refund after the SPAC entity identifies a target company.  Vellar would then return that number of shares to LNZA, the post-merger surviving entity, three years later.  This type of forward purchase transaction was a common financing mechanism in SPAC deals, designed to help ensure AMCI and LNZA met necessary preconditions for their merger, while also providing LNZA the possibility of a substantial future profit if the price of its stock increased meaningfully after the merger.

4. Regardless of how LNZA's stock performed, the parties' agreement was clear that LNZA would owe Vellar a pre-determined amount of consideration at the end of the transaction. That consideration was a material inducement for Vellar to enter the transaction.  Ultimately, Vellar hoped to secure a relatively stable return while limiting its downside exposure to the price of LNZA stock.

5. Yet, since the parties entered into the forward purchase agreement, LNZA's financial performance has steadily deteriorated, and its share price has declined more than 80% from where it first started trading.  As a result of LNZA stock's persistent poor performance, Vellar had the option under the parties' contract to accelerate termination of the transaction, which Vellar exercised on July 22, 2024.  LNZA, however, has refused to pay Vellar the end-of-deal consideration to which Vellar is entitled.  LNZA is not entitled to abandon its contractual obligations simply because its business has not gone according to plan, and Vellar brings this action to recover damages and hold LNZA to the bargain it struck.

## JURISDICTION AND VENUE

6. Subject matter jurisdiction exists under 28 U.S.C. § 1332, there being complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy substantially exceeding $75,000.

7. This Court may exercise personal jurisdiction over Defendant pursuant to 28 U.S.C. § 1391 based on the terms of the Assignment and Novation Agreement between Vellar and LNZA. Section 8 of that Agreement provides that "any proceedings arising among the Parties in any matter pertaining or related to this Agreement shall, to the extent permitted by law, be heard solely in the State and/or Federal courts located in New York City."

8. Venue is also proper based on the Assignment and Novation Agreement, by which Defendant agreed that "the State and/or Federal courts located in New York City" would have exclusive jurisdiction over "any proceedings arising among the Parties in any matter pertaining or related to this Agreement."

## THE PARTIES

9. Plaintiff Vellar Opportunity Fund SPV LLC - Series 10 (previously defined as "Vellar") is a limited liability company, which is a citizen of each state where one or more of its members is a citizen. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 60 (2d Cir. 2016). Vellar has one member, Vellar Opportunities Fund Master Ltd. ("Vellar Master"). Vellar Master is a Cayman Islands exempted corporation. Vellar Master does not have an office or employees, nor does it engage in substantial ongoing business operations. As a Cayman Islands exempted corporation, Vellar Master is a foreign citizen for purposes of federal diversity jurisdiction. Vellar Master has two directors, Solomon Cohen and Daniel Cohen. Vellar Master's day-to-day activities are primarily controlled by Solomon Cohen. Mr. Cohen is domiciled in Florida but spends the majority of his time traveling, often internationally. To the best of his knowledge, Mr. Cohen has never directed Vellar Master's activities from Delaware or Illinois. Mr. Cohen also has never resided or been domiciled in Delaware or Illinois while serving as director of Vellar Master. To

the extent that Vellar Master is held to have a principal place of business,[1] its principal place of business is not located in Delaware or Illinois, and Vellar Master is not a citizen of Delaware or Illinois for purposes of federal diversity jurisdiction. Because Vellar's citizenship rests entirely on Vellar Master's citizenship, Vellar also is not a citizen of Delaware or Illinois.

10. Defendant LanzaTech Global, Inc. (previously defined as "LNZA") is a corporation formed under Delaware law with its principal place of business in Illinois.

## FACTS

### I. Background On SPACs

11. A special purpose acquisition company, or "SPAC," is a company formed to raise capital via an initial public offering for the express purpose of finding another company with which to merge. That subsequent merger between a SPAC entity and a target company is often called a "de-SPAC" transaction.

12. In a typical SPAC IPO, the SPAC will sell "units" to investors for $10 per unit. A unit consists of a single Class A common share and a fractional warrant with a strike price of $11.50. Amounts raised from investors are held in trust.

13. SPAC investors may freely trade their Class A shares and warrants during the SPAC's "search" period, during which the SPAC seeks out a merger target to complete a de-SPAC transaction.

14. SEC rules limit the duration of the SPAC's search period to two years, which may be extended through a vote of the SPAC shareholders for up to one additional year. If the search window closes before the SPAC can complete a de-SPAC transaction, it will dissolve and return

---

[1] *See First St. Ins. Co. v. XTRA Corp.*, 583 F. Supp. 3d 313, 317-18 (D. Mass. 2022) (noting that "inactive" corporations that lack substantial operations may have no principal place of business for purposes of federal diversity jurisdiction).

capital to shareholders on a pro-rata basis (effectively giving back investors $10 per share plus interest).

15. As inducement to potential merger targets, the SPAC can offer a public listing along with the capital in the SPAC's trust account.

16. Investors in the SPAC can benefit by becoming shareholders in the merger target immediately following the de-SPAC. This can be attractive to retail investors who are not ordinarily able to obtain shares in newly public companies through the IPO process and usually must wait for shares to become available on the secondary market.

17. SPAC governance mechanisms create protections for SPAC shareholders should they disagree with the judgment of the SPAC's management regarding the proposed target company and de-SPAC merger. Shareholders must vote to approve a de-SPAC transaction and, regardless of how shares are voted, shareholders may elect to "redeem" their shares—effectively tendering the shares back to the SPAC in exchange for a pro-rata portion of the trust account (roughly $10 plus interest).

18. Redemptions deplete the SPAC's trust account and result in the merger target receiving less capital after the de-SPAC is consummated. Because the final amount of capital contributed by the SPAC is often uncertain but is nonetheless material to the target company, de-SPAC merger agreements frequently include provisions making the deal contingent on a minimum amount of cash remaining in the trust. In other words, target companies often seek to ensure that a minimum number of shares will remain outstanding and unredeemed.

19. To further mitigate the risk to potential merger targets, SPAC sponsors will often attempt to secure financing through a subscription agreement, often referred to as a private investment in public equity ("PIPE"). PIPE financing provides an injection of additional capital

for the merger target. This PIPE financing, however, is contingent on the successful completion of the de-SPAC transaction, which necessarily requires the SPAC entity to satisfy any and all conditions precedent in the merger agreement with the target company.

## II.     The SPAC Boom (And De-SPAC Bust)

20.     Dating back to the 1990s, the SEC and its promulgated rules have permitted the formation of SPACs to take private companies public. For decades, however, SPAC deals represented only a small minority of initial public offerings.

21.     That changed starting in late 2019, and SPAC IPO activity increased exponentially. The year 2020 saw more SPAC IPOs than had occurred in all of the previous ten years. That growth continued into 2021, a year in which SPACs raised a combined $162 billion in invested capital—150 times the amount raised by SPACs ten years earlier. The boom in SPAC formation also led to a wave of successful de-SPAC transactions. The boom also created interest from investors and service providers that had not previously focused on SPACs, who were brought into the fold by their desire to participate in a trendy, growing market.

22.     However, like many financial fads, the SPAC bubble did not last long. In 2022, there was a marked decline in new SPAC formation, as well as a rising tide of SPAC liquidations. Many SPACs formed during the pandemic-era boom reached the end of their search period without having identified a suitable target company to take public, and they accordingly were forced to dissolve and return capital to their investors.

23.     The reversal of the SPAC trend accelerated due to many factors, including the Federal Reserve aggressively raising interest rates to combat inflation and, more generally, oversaturation of the market, and decreased investor appetite for investing in riskier, early-stage companies (the type often targeted by SPACs). Consequently, high levels of redemptions have become a persistent feature of de-SPAC transactions in recent years, making the prospect of a

SPAC IPO less attractive from the from the point of view of potential merger targets. In sum, by late 2022, the competitive landscape for SPAC entities in search of a merger target looked very different than it had even a year prior.

### III. Alternative Financing Transactions For SPAC Deals

24. SPACs can use various strategies to address the risks that redemptions pose to completing a de-SPAC transaction, including by obtaining structured financing designed to ensure that conditions underlying a proposed de-SPAC, such as minimum cash requirements, will be satisfied.

25. Prepaid equity forward purchase agreements are one such financing solution that SPACs commonly use to ensure that they can successfully complete a contemplated merger.

26. At a high level, a prepaid forward transaction involves a financing provider (typically referred to as the "Seller" in the contract) purchasing the SPAC's shares from existing shareholders on the open market and waiving the right to redeem those shares. Second, following the completion of the de-SPAC merger, the surviving entity pays the Seller the redemption value of the shares (the "prepayment"). Third, at termination the Seller delivers the shares subject to the transaction back to the post-merger surviving company in exchange for additional consideration.

### IV. Vellar Commits To Provide LNZA Financing In Exchange For Terms Favorable To Vellar

27. This action arises out of the breach of a prepaid forward purchase agreement entered into by Plaintiff Vellar, a SPAC named AMCI Acquisition Corp. II ("AMCI"), and Defendant LNZA—the entity that survived a de-SPAC merger with AMCI.

28. AMCI was formed during 2021 with an expressed intent of effecting a de-SPAC merger with a company operating in the "clean energy" sector.

29.     LNZA, a carbon recycling company, and AMCI agreed to merge on March 8, 2022, but the parties were not able to quickly consummate the de-SPAC transaction, which the parties referred to as the "Business Combination."

30.     In the months that followed, LNZA and AMCI discussed how they could complete the proposed merger, including by raising additional capital and minimizing redemptions by AMCI stockholders.

31.     Among the key impediments to the Business Combination was the Minimum Closing Cash Condition in the merger agreement, which was ultimately a focal point of negotiations to amend the terms of the merger. The amended merger agreement between AMCI and LNZA included a reduction in the Minimum Closing Cash Condition along with AMCI's promise to undertake commercially reasonable efforts to "enter into non-redemption agreements with public stockholders, representing an amount as may be necessary to satisfy the revised Minimum Closing Cash Condition."

32.     AMCI, LNZA, and an affiliate of Atalaya Capital Management called ACM ARRT H LLC ("ACM") entered into one such "non-redemption agreement[]" in the form of a prepaid forward purchase transaction, memorialized by a written agreement entitled "Confirmation Re: Equity Prepaid Forward Transaction" on February 3, 2023, shortly before and in conjunction with the Business Combination.

33.     The same day, ACM, AMCI, and LNZA entered into an Assignment and Novation Agreement with Vellar, whereby Vellar assumed 50% of the obligations and benefits ACM ARRT H had under the FPA.[2]

---

[2] A true and correct copy of the Assignment and Novation Agreement, which attaches the Confirmation Re: OTC Equity Prepaid Forward Transaction as exhibit A (the "FPA") is

34. The FPA took the general form previously described, *see supra* ¶ 26, involving an upfront acquisition of shares by Vellar, prepayment by LNZA for the shares, and an exchange at termination where Vellar would redeliver shares and LNZA would pay Vellar additional consideration. On top of that general structure, the FPA contained the following specific provisions.

    A.    *Vellar's Acquisition Of Shares And Commencement Of The Transaction*

35. The FPA required Vellar to acquire AMCI shares in the open market from third parties in an amount of at least 4 million (Ex. 1 (FPA) at "Additional Termination Events") and not more than 10 million Shares (*id.* at "Maximum Number of Shares") with the precise number of Shares reflected in a "Pricing Date Notice" to be provided by Vellar—defined as the initial number of "Recycled Shares."[3] *Id.* at "Number of Shares." In return, the FPA obligated LNZA to pay Vellar—following the closing of the Business Combination—the same price available to AMCI shareholders electing to redeem their shares (around $10 per share) for each share reflected in the Pricing Date Notice, with this amount defined as the "Prepayment Amount." *Id.* at "Prepayment Amount," "Prepayment Date."

36. At the time the Prepayment Amount became due, LNZA had the option to underpay by up to $2.5 million. *Id.* at "Prepayment Shortfall." Upon completion of the Business Combination, LNZA had 30 days in which to pay off the Prepayment Shortfall. *Id.* at "Prepayment Shortfall Consideration." In the event of a Prepayment Shortfall, the FPA allowed Vellar to reduce

---

attached hereto as Exhibit 1. A true and correct copy of the 2002 ISDA Master Agreement, which the FPA incorporates by reference, is attached hereto as Exhibit 2.

    [3] Because Vellar has assumed 50% of AMC ARRT H's rights and obligations under the FPA, it was entitled to include between 2 million and 5 million shares on the Pricing Date Notice.

its obligation to deliver shares by selling a number of shares that would cancel all or part of the existing Prepayment Shortfall.  *Id.* at "Shortfall Sales."

37. As it transpired, LNZA elected to pay the full Prepayment Amount, so there was never a Prepayment Shortfall, and these provisions are inoperative with respect to the FPA.

### B.   *Termination Of The FPA On The Maturity Date*

38. Following Vellar's issuance of the Pricing Date notice and LNZA's payment of the Prepayment Amount, the FPA contemplated that the transaction would continue until terminated on the Valuation Date, defined in pertinent part as:

> The earliest to occur of (a) the third anniversary of the closing of the [Business Combination] … and (b) the date specified by [Vellar] in a written notice to be delivered to [LNZA] at [Vellar]'s discretion (not earlier than the day such notice is effective) after the occurrence of any of a … Seller VWAP Trigger Event … (in each case the "Maturity Date").[4]

*Id.* at "Valuation Date."  A Seller VWAP Trigger Event "occurs if the VWAP Price is below … (1) $2.00 per Share for any 50 trading days during a 60 consecutive trading day-period that ends during the first 90 days after the date of this Confirmation, and (2) $3.00 per Share thereafter."  *Id.* at "Seller VWAP Trigger Event."

39. Upon the occurrence of the Valuation Date, Vellar must deliver the same Number of Shares it originally acquired to LNZA (subject to netting), while LNZA must pay the Maturity Consideration.  The Maturity Consideration is defined in pertinent part as "an amount equal to the product of (1) (a) … 7,500,000 … multiplied by … $2.00," or $15,000,000.[5]  Ex. 1 (FPA) at

---

[4]  The acronym VWAP refers to the volume weighted average price of the shares as calculated by Bloomberg.  Ex. 1 (FPA) at "VWAP Price."

[5]  Because Vellar has assumed 50% of AMC ARRT H's rights and obligations under the FPA, it is entitled to half the amount specified in the definition of Maturity Consideration, or $7,500,000.

"Maturity Consideration." The Maturity Consideration is therefore a fixed amount that does not change based on the current market value of LNZA's stock.

40. LNZA may elect to pay the Maturity Consideration "in cash or … Shares," with the number of Shares required to satisfy the Maturity Consideration amount depending upon the average recent trading price of the Shares. *Id.* The FPA defines shares issued by LNZA to satisfy the Maturity Consideration as "Maturity Shares." *Id.* To illustrate: If the mean of the daily VWAP for the immediately preceding 30 trading days for the shares was $20 per share, then LNZA would owe 375,000 shares to cover Vellar's 50% interest in the Maturity Consideration; by contrast, if such mean were $2 per share over the prior 30 trading days, then LNZA would owe 3.75 million shares. Vellar then could elect to settle the transaction on a net basis, subtracting the Maturity Shares from the number of shares owed to LNZA. *Id.*

41. Where LNZA's share price is sufficiently low and it has elected to satisfy a large enough proportion of the Maturity Consideration by issuing Maturity Shares, Vellar would retain all of the Recycled Shares while being entitled to additional "Maturity Shares payable to [Vellar]" by LNZA. *Id.* In other words, if the mean of the daily VWAP for the immediately preceding 30 trading days for the shares was $2 per share, then LNZA would owe Vellar 3.75 million in shares in respect of its share of the Maturity Consideration; if Vellar had acquired 3 million in shares, then it could elect to fully net the share delivery (delivering no shares), and LNZA would be required to deliver 750,000 additional shares to Vellar.

42. Upon the occurrence of the Valuation Date, LNZA also owed roughly $5 million—of which Vellar was entitled to approximately $2.5 million—as "Share Consideration," payable only in cash. *Id.* at "Share Consideration."

  **C.** **The FPA Facilitated the Business Combination While Offering LNZA Attractive Potential Upside—But Only If Its Stock Performed Well**

  43. Vellar commenced the transaction by providing a Pricing Date Notice on February 6, 2023 specifying 2.99 million shares as the initial Number of Shares. Following the closing of the Business Combination, LNZA tendered the required prepayment in full.

  44. The forward purchase transaction that Vellar ultimately struck with AMCI and LNZA was one such "non-redemption agreement." In fact, the investors who held the shares that Vellar ultimately purchased pursuant to the FPA had previously elected redemption before selling the shares to Vellar. Upon acquiring those shares, Vellar reversed that redemption request. Consequently, but for Vellar's willingness to enter into the forward purchase transaction, the nearly 3 million Recycled Shares that Vellar purchased would have been redeemed. That would have permanently depleted AMCI's trust account and frustrated AMCI's ability to satisfy the Minimum Closing Cash Condition for the merger with LNZA.

  45. The FPA also permitted LNZA to pay less than the full prepayment amount via a "shortfall" mechanism, *see supra* ¶ 36, with the amount of any shortfall counting toward the Minimum Closing Cash Condition. At one point during the negotiations, the parties contemplated a maximum shortfall of $12.5 million, which would have represented over one fourth of the minimum trade size (of 4 million shares). Any shortfall increases the Seller's (here, Vellar's) economic exposure to the SPAC's underlying stock, amplifying the risk of the deal. Because of this added risk, the forward purchase agreement included a number of other terms that were favorable to Vellar, such as protective provisions in the event of a future dilutive stock offering by LNZA and Vellar's option to accelerate the transaction in the event that LNZA's share price fell below a defined threshold.

46. Thus, the transaction with Vellar allowed AMCI and LNZA to limit redemptions and confirm additional capital to help satisfy the Minimum Closing Cash Condition. In addition, LNZA could earn a future profit from the transaction if LNZA's stock price appreciated following the merger with AMCI. That is because Vellar was obligated to return the purchased shares to LNZA at termination in exchange for predetermined additional compensation. To the extent LNZA's business succeeded, and its stock was worth more than the compensation it owed Vellar under the FPA, LNZA could receive a windfall in equity capital when the FPA matured and it received the nearly 3 million shares from Vellar.

47. If LNZA's stock price had increased substantially, it also would have made sense for Vellar to invoke an Optional Early Termination provision in the FPA with respect to some or all of the at-issue shares. The FPA empowered Vellar to terminate the transaction in whole or part before any condition for a Valuation Date had occurred if Vellar, "in its absolute discretion," issued a notice called an "OET Notice" and paid LNZA an amount, defined as the "Early Termination Obligation," equal to the Prepayment Amount associated with the shares being terminated.[6] Ex. 1 (FPA) at "Optional Early Termination." At a high price per share, the proceeds from a sale of the Recycled Shares would yield profits exceeding the Maturity Consideration and Share Consideration, even after accounting for the Early Termination Obligation Vellar would have owed to LNZA.

48. In the scenario where LNZA's share price increased significantly, LNZA could also have benefited even if Vellar chose not to conduct an Optional Early Termination. Without an

---

[6] In the event that LNZA had engaged in a dilutive stock offering following the date of the FPA by selling additional stock at a price lower than that used to calculate the Prepayment Amount, the Early Termination Obligation would have been reduced to reflect the lower per-share price of the dilutive offering. *See* Ex. 1 (FPA) at "Dilutive Offering Reset" & "Reset Price."

early termination, LNZA would have received the entire initial amount of Recycled Shares back on the Maturity Date. LNZA could then sell those shares to generate cash proceeds in excess of the Maturity Consideration and Share Consideration.

49. Under either of these scenarios, the "breakeven" point at which the FPA is expected to generate positive value to LNZA occurs at roughly $13.50 per share. LNZA first began publicly trading at roughly $10 per share. In other words, LNZA would realize a positive benefit from the FPA only if the price of its stock increased by more than 30% within three years of the merger with AMCI.

50. For its part, Vellar was able to enter into a structured financing transaction that promised stable returns to Vellar in the form of the fixed Maturity Consideration and Share Consideration.

## V.  A Termination Event Occurs But LNZA Fails To Pay What It Owes

51. LNZA underperformed financially in 2023, and by the first quarter of 2024, that underperformance became impossible for the market to ignore.

52. In February 2024, LNZA reported revenue for 2023 of $62.6 million, significantly below the company's previously issued forward guidance of $80 to $100 million of revenue for 2023. Further, the company reported a cash burn of $15.5 million during the fourth quarter of 2023.

53. In May 2024, LNZA reported its first quarter earnings for 2024, which reflected further deterioration in LNZA's financial performance. For that quarter, LNZA reported revenue of only $10.2 million and further acceleration in its rate of cash burn (which nearly doubled compared to the fourth quarter of 2023) to $29.2 million.

54. In response to these developments, analysts who cover LNZA began slashing their price targets for the stock, and new analysts initiated coverage at price targets consistent with the

stock breaching the VWAP Trigger (for example, TD Cowen initiated coverage in May 2024 with a $3 price target).

55. LNZA's stock price began trading down. By June 2024 it had been persistently below the Seller VWAP Trigger Event level of $3.00 per share for weeks, and it appeared likely that a Seller VWAP Trigger Event would soon occur.

56. As of July 1, 2024, the VWAP of LNZA's stock had been below $3.00 for at least 50 of the preceding 60 trading days. As a result, a Seller VWAP Trigger Event occurred on that date. Vellar accordingly sent a notice letter to LNZA stating that a Seller VWAP Trigger Event had occurred and that Vellar was reserving the right to terminate the transaction.[7]

57. Vellar issued a notice terminating the transaction on July 22, 2024.[8] Pursuant to that notice, LNZA had until July 24, 2024 to settle the transaction.

58. But LNZA failed to make good on its promise to pay the Maturity Consideration and Share Consideration when due. Vellar provided a notice of LNZA's settlement default on July 25, 2024, after which LNZA had a two-day grace period to cure its settlement default.[9] Following the expiration of that grace period, LNZA's settlement default matured into an Event of Default under the terms of the 2002 ISDA Master Agreement, the terms of which are incorporated by reference into the FPA. Ex. 2 at § 5(a)(i). Accordingly, Vellar provided an additional notice of settlement default on July 30, 2024.[10] That notice specified that Vellar was designating the date

---

[7] A true and correct copy of the July 1, 2024 notice letter is attached hereto as Exhibit 3.

[8] A true and correct copy of the July 22, 2024 notice letter is attached hereto as Exhibit 4.

[9] A true and correct copy of the July 25, 2024 notice letter is attached hereto as Exhibit 5.

[10] A true and correct copy of the July 30, 2024 notice letter is attached hereto as Exhibit 6.

15

of the notice as an "Early Termination Date" pursuant to Section 6(a) of the 2002 ISDA Master Agreement, and that an amount of $4,163,701 was immediately due and payable thereunder.

59. As a result of LNZA's failure to pay amounts that are unequivocally due and owing to Vellar under the FPA, Vellar has been deprived of the benefit of its bargain. Through the transaction, it sought stable returns with minimal exposure to the performance of LNZA's stock. LNZA must make good on its promise and pay the millions of dollars that it owes to Vellar.

## CAUSES OF ACTION

### Count 1 – Breach of Contract
### Failure to Pay Maturity Consideration And Share Consideration

60. Vellar repeats each of the foregoing allegations as if fully set forth herein.

61. At all times relevant to this Complaint, Vellar and LNZA were parties to a valid and enforceable contract, namely the FPA.

62. The FPA sets forth the conditions precedent to termination of the agreement and LNZA's obligations upon termination.

63. As of July 1, 2024 a Seller VWAP Trigger Event was in effect, enabling Vellar, at its discretion, to terminate the FPA by providing a valid notice to LNZA specifying a Valuation Date.

64. Vellar provided valid notice to Defendant on July 22, 2024, specifying that date as the Valuation Date.

65. The FPA required that LNZA settle the transaction by paying the Maturity Consideration and Share Consideration on or before July 24, 2024.

66. LNZA failed to pay the Maturity Consideration and Share Consideration when due.

67. Vellar provided further notices of LNZA's settlement default, which has matured into an Event of Default under the FPA and the terms of the 2002 ISDA Master Agreement, which the FPA expressly incorporates.

68. The Event of Default remains uncured and ongoing because LNZA has not paid the amount it owes to-date.

69. Pursuant to the FPA and the 2002 ISDA Master Agreement, Vellar is entitled to damages in an amount no less than $4,163,701, plus interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiffs' favor and against Defendant as follows:

A. Awarding general and compensatory damages to Vellar in an amount to be proven at trial;

B. Awarding Vellar pre and post-judgment interest thereon;

C. Awarding Vellar costs and disbursements, including attorney's fees, related to this dispute; and

D. Granting such other and further relief as the Court deems just and proper.

| | | | |
|---|---|---|---|
| Dated: | October 23, 2024<br>New York, NY | | **QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP** |
| | | By : | /s/ *Ellison Ward Merkel*<br>Ellison Ward Merkel<br>Phillip B. Jobe<br>Jeffery Arnier |

51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
ellisonmerkel@quinnemanuel.com
philipjobe@quinnemanuel.com
jefferyarnier@quinnemanuel.com

*Attorneys for Plaintiff Vellar
Opportunity Fund SPV LLC - Series 10*